Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3626 | **DATE** | 5/4/2001 |
| **CASE TITLE** | Telemark Development Group vs. John P. Mengelt | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in this memorandum opinion and order, Telemark's motion is granted (24-1) as to liability and Mengelt's is denied(21-1), but the precise scope of Telemark's (or perhaps Mengelt's) relief remains for future determination. A status hearing is set for 8:30 a.m. May 23, 2001 to discuss the necessary procedures and schedules to that end.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 07 2001 date docketed | 30 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 5/4/2001 date mailed notice | |
| SN | courtroom deputy's initials | | SN mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TELEMARK DEVELOPMENT GROUP, INC., )
)
Plaintiff, )
)
v. ) No. 00 C 3626
)
JOHN P. MENGELT, )
)
Defendant. )

MAY 07 2001

MEMORANDUM OPINION AND ORDER

Telemark Development Group, Inc. ("Telemark") has sued John Mengelt ("Mengelt") for breach of contract on a $55,000 promissory note, alleging that Mengelt refused to accept payment on the note and refused to return stock given as collateral security. Mengelt has countersued, seeking as damages the principal balance and accrued interest owed on the note. Both sides have now moved for summary judgment under Fed. R. Civ. P. ("Rule") 56.[1] For the reasons stated in this memorandum opinion and order, Telemark's motion is granted as to liability and Mengelt's is denied, but the precise scope of Telemark's (or perhaps Mengelt's) relief remains for future determination.

## Facts

Familiar Rule 56 principles impose on each movant the burden

---

[1] Both sides have complied with this District Court's LR 56.1, adopted to implement Rule 56. This opinion cites to Mengelt's LR 56.1(a)(3) statement as "M. St. ¶--" and to Telemark's LR 56.1(a)(3) statement as "T. St. ¶--." This opinion also employs the same "M." and "T." abbreviations in referring to the parties' exhibits and to their memoranda ("Mem.") and responsive memoranda ("R. Mem.").

of establishing both the lack of a genuine issue of material fact and the movant's entitlement to a judgment as a matter of law (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., Inc., 116 F.3d 262, 265 n. 2 (7th Cir. 1997)). Where as here cross-motions for summary judgment are involved, it is necessary to adopt a dual perspective--one that this Court has often described as Janus-like--that sometimes involves the denial of both motions. That is not the case here, for Telemark's motion as to liability succeeds even from a pro-Mengelt perspective.

## Facts

In 1994 Telemark and Mengelt entered into a joint venture to develop real estate in Arizona. After Telemark had failed to repay Mengelt according to the terms of the original joint venture agreement, further documentation and correspondence ensued, culminating on August 27, 1997 with Telemark's execution and delivery to Mengelt of a promissory note ("Note") in the principal amount of $55,000 plus interest of 12% per annum retroactive to April 15, 1997, with the total to be paid by April 15, 1998 (M. St. ¶¶4,5,6,7; T. St. ¶5). As security for the Note Telemark endorsed to Mengelt 160,000 shares of Wasatch

International, Inc. ("Wasatch"), a publicly traded corporation (T. St. ¶6).[2]

On April 6, 1998 Telemark partner Lawrence Muno ("Muno") wrote Mengelt a letter saying that Telemark did not have sufficient funds to pay the Note on its April 15 due date (M. St. ¶9). Telemark did not in fact pay the note when it became due (T. St. ¶7). Then Muno sent Mengelt another letter on December 23, 1998, again stating that Telemark lacked the money to satisfy the Note (M. St. ¶11).

More than a year elapsed without any further communication between the parties. Then Telemark's counsel sent a March 7, 2000 letter to Mengelt that stated in relevant part (M. Ex. J):

> It is my clients' desire to reconcile the as yet unpaid amount due to you under the terms of the promissory note. The settlement we would propose would pay you the principal sum of $55,000.00 (Fifty Five Thousand Dollars) plus interest at the rate of 12% per annum through April 15, 2000. The computed total under this plan payable to you is $77,270.00 (Seventy-Seven Thousand Two Hundred and Seventy Dollars).
>
> The formula we propose is the return of the 160,000 shares of Wasatch International stock advanced to you as collateral at the time of execution in exchange for certified funds in the amount of $77,270.00.

---

[2] From the parties' most recent filings it appears that Wasatch has now become known as E-Pawn.com, Inc. ("E-Pawn"), although neither side has explained why the stock trading information that they have provided (more on this subject later) is in the latter name, or what transaction may have led to the new identity. But because the original documentation at issue here and all of the parties' other submissions have consistently spoken of Wasatch, this opinion will do the same.

Mengelt promptly refused that offer, telling Telemark's counsel that he would insist on some $200,000 to release the Wasatch stock (Mengelt Dep. 41-42). At that time Mengelt understood the stock to be worth about $1.5 million (id. 35), and in fact the March 8 over-the-counter quote was $8.50 per share (amounting to $1.36 million). And Mengelt's own testimony (id. 41-42) confirmed that his demand for some 2-1/2 times the amount due on the Note was based on his calculation of what he had probably failed to earn in market investments because the Note had not been paid on its due date--hence the Mengelt demand had nothing to do with any claim (one that he did not assert) that he had acquired ownership of the then far more valuable Wasatch stock held as collateral.

Then on March 26 Telemark's counsel faxed Mengelt a proposed settlement agreement that (1) again called for Telemark to pay Mengelt $77,270 in exchange for a return of the Wasatch stock held as collateral and (2) further provided that the parties would "agree to forever hold each other harmless from any and all future claims regarding the subject note" (M. Ex. K). Mengelt did not sign that settlement agreement (M. St. ¶16).

Telemark proceeded to file this action on June 15, 2000, alleging that Mengelt had breached the parties' agreement by refusing its tender and relatedly by failing to return the stock. Telemark seeks damages in the amount of the value of the stock on

4

March 7, 2000 less the amount due on the Note. Mengelt has countersued to collect the principal and interest accrued on the Note.

## Tender of Payment?

Both parties' submissions focus on whether Telemark's March 7 offer constituted a "tender of payment" under Illinois law.[3] Brown & Kerr, Inc. v. American Stores Props., Inc., 306 Ill.App.3d 1023, 1032, 715 N.E.2d 804, 812 (1st Dist. 1999) defines that term:

> "Tender" is an unconditional offer of payment consisting of the actual production of a sum not less than the amount due on a particular obligation. MXL Industries, Inc. v. Mulder, 252 Ill.App.3d 18, 29, 191 Ill.Dec. 124, 623 N.E.2d 369 (1993). A tender must be without conditions to which the creditor can have a valid objection or which will be prejudicial to his rights. MXL, 252 Ill.App.3d 18, 29, 191 Ill.Dec. 124, 623 N.E.2d 369.

If Telemark's March 7 offer constituted a tender (or constructive tender), it is not liable for any interest accrued after that date (810 ILCS 5/3-603(c)).[4] Telemark also contends that if it

---

[3] Under the terms of the Note (Ex. A to Answer and Counterclaim), Illinois law governs this dispute.

[4] As for the interest accrued before that date, Telemark now asserts (as it clearly did not when it made its March 7 offer of payment) that for the post-April 15, 1998 period interest should be calculated at only 5% annually pursuant to 815 ILCS 205/2. That statute specifies a 5% default rate where the instrument does not contain one. But here the Note unambiguously provides for the accrual of interest at 12% from and after April 15, 1997, with no distinction made between payment on the due date and payment thereafter. It comes with ill grace for Telemark to make its current argument--after all, it clearly understood that the Note provided for 12% interest both before

5

did tender payment, Mengelt was then obligated under the terms of the Note to return the Wasatch stock that had been left with him purely as collateral security.

For his part, Mengelt urges that the March 7 offer did not amount to a "tender of payment" because Telemark never actually produced any money and because the offer was not unconditional. Those contentions will be dealt with in turn.

As to Mengelt's first point, Telemark does not dispute that it never sent Mengelt money to pay the Note. Telemark contends, however, that its obligation actually to tender funds was excused by Mengelt's refusal of its offer to pay. In Illinois the long-standing rule is that tender is excused where it is known that the tender would not be accepted by the creditor. As Needy v. Sparks, 74 Ill.App.3d 914, 918, 393 N.E.2d 1252, 1255 (1st Dist. 1979) quoted from the then-nearly-century-old opinion in Gorham v. Farson, 119 Ill. 425, 442, 10 N.E. 1, 7 (1887):

> Where a creditor, in advance of an offer to pay, or in response to such offer, informs the party under obligation to pay that he will not accept the amount actually due in discharge of the indebtedness, the party under obligation to pay is relieved of the duty of tendering the amount actually due.

Accord, Burnham Mgmt. Co. v. Davis, 302 Ill.App.3d 263, 273, 704 N.E.2d 974, 982 (2d Dist. 1998).

On that score, Mengelt responded to Telemark's March 7 offer

---

and after default when its tender offer calculated its obligation through April 15, 2000 to be $77,270.

6

by telling Telemark's counsel in a telephone conversation that "any kind of settlement he might propose should be much more substantial in line with what I might have made in the stock market" (Mengelt Dep. 40)--a mindset, it should be noted, that led to his asking for some $200,000 even though Telemark's $77,270 figure had mirrored the terms of the Note exactly. Mengelt contends that his statement alone does not equate to a refusal of tender. He seems to suggest that a reasonable factfinder could determine that while Mengelt would not accept the proposed amount as full satisfaction of the note, Mengelt would have accepted a draft for that amount as partial satisfaction.

But Mengelt cannot now argue in good conscience that he would have accepted that amount as "partial satisfaction" of an amount he claimed was due under the Note, because he really never disputed (nor could he) that the amount offered would have fully satisfied Telemark's obligations under the Note. Mengelt has never said that Telemark somehow miscalculated its obligations under the Note. Instead Mengelt says that he rejected the offer because he was engaged in "hard bargaining" (M. R.Mem. 3 n. 3). Such an outright rejection of a debtor's offer to pay an obligation in full is precisely what is contemplated by the caselaw that excuses the actual tender of payment under such

7

circumstances.[5]

Next Mengelt says that Telemark's tender was ineffective because it was not unconditional. As proposed proof of that position, Mengelt points to the hold-harmless provision in the March 26 proposed settlement agreement. But Mengelt's attempted reliance on the terms of that proposal is misplaced, because Telemark argues only that its earlier March 7 offer constituted a tender. After all, when such an unconditional full tender has been rejected, together with an accompanying demand for more than is owed, the offeror can scarcely be faulted for including in a renewed tender a request for a confirmation that acceptance of the renewal will end the matter. Hence the relevant inquiry remains whether the March 7 offer was unconditional, unaffected by what was contained in the post-refusal March 26 followup.

---

[5] Seeking to rely on Schmahl v. A.V.C. Enters., Inc., 148 Ill.App.3d 324, 499 N.E.2d 572 (1st Dist. 1986), Mengelt also urges that because Telemark did not have the funds to pay the debt when it made its March 7 offer, it is not entitled to the protections provided by 810 ILCS 5/3-603 in the event of a refusal of tender. But in Schmahl, id. at 326, 499 N.E.2d at 573 the debtor acknowledged that he did not have sufficient funds to retire the debt completely in cash, so he offered the creditor a combination of cash and some illiquid property (real estate) to satisfy the debt. Schmahl, id. at 330, 499 N.E.2d at 576 held in that situation that the debtor's proposal was not the "equivalent of tender" because it did not represent "full accord with the obligation under the note." By contrast, on March 7 Telemark offered Mengelt a complete cash payment in accordance with the terms of the Note. Furthermore, Muno testified that Telemark had enough resources to pay the Note (Muno Dep. 63). Mengelt's speculation to the contrary does not raise a genuine issue of material fact.

In that respect, it is true that the word "settlement" was used in submitting the March 7 offer. Thus Mengelt could reasonably have believed that if he accepted that offer he would be foreclosed from arguing in the future that the tendered $77,270 did not fully satisfy Telemark's obligations under the Note. But it is readily apparent that any such belief--which may be viewed as entirely accurate--does not assist Mengelt at all.

In that respect Telemark responds that even if the offer were indeed viewed as conditioned on an admission by Mengelt that no greater amount was due, Mengelt could not have a valid objection to such a condition because Telemark was offering him everything to which he was entitled under the Note. Under different circumstances that position might perhaps be at odds with the general rule that even where a tender is in fact for the full amount due, such a condition nevertheless renders tender ineffective--as stated in 74 Am. Jur. 2d <u>Tender</u> §25, at 562-63 (2d ed. 1974 and 2000 supp.)(hereafter cited simply as "Am. Jur. §--," omitting the volume number):

> But tender of an amount less than the creditor claims is due him is not effectual where coupled with conditions which render its acceptance by the creditor an admission that no greater amount is due. This rule applies as well where the tender is in fact of an amount in full of all claims as where it is not; whether or not the amount of money tendered is in full is a question that the creditor has a right to contest in every case.

But in this case Mengelt did not have any basis whatever for a good faith claim that more than $77,270 was due on the Note at

9

the time of the offer--and indeed, as already discussed, Mengelt has never really made such an argument (contrast <u>United Gas Pipe Line Co. v. Tyler Gas Serv. Co.</u>, 162 F.Supp. 496, 501 (E.D. Tex. 1958), which held a tender that was conditioned on acceptance as full payment was ineffective even though it was determined to have been in full, because the creditor had a good faith claim that different rates applied). Because Mengelt was not actually contesting the amount due, Telemark's tender was not rendered ineffective because of that condition.

Nor is that conclusion altered by the fact that the March 7 offer was also conditioned on the return of the Wasatch stock held as collateral. Because the Note expressly contemplates the return of the collateral upon payment of the Note, that condition did not render the tender suspect, let alone invalid. <u>Martindell v. Lake Shore Nat'l Bank</u>, 15 Ill.App.2d 217, 226, 145 N.E.2d 784, 789 (1st Dist. 1957)(citations omitted), rev'd on other grounds, 15 Ill.2d 272, 154 N.E.2d 683 (1958) provides the rule:

> However, where an offer of payment is conditioned upon the surrender of collateral security, and the offer is refused, there has been a valid tender, if in any subsequent proceeding to enforce his rights the debtor is willing to pay into court the amount due on the debt. In Illinois a tender may be accompanied by any conditions specified in the contract between the parties.[6]

---

[6] [Footnote by this Court] On that issue, see also Am. Jur. §26:

> Where a tender in full is made of an obligation, the debtor has the right to demand a surrender of all securities,

10

In this case that result is also not altered by the fact that the tender was made after default. Had the default operated to vest in Mengelt rights that he did not possess before that time, Telemark could not have conditioned its tender on a surrender of those new rights (see Am. Jur. §18, at 557). It is quite true that under the terms of the Note Mengelt had the right, when Telemark failed to make payment on April 15, 1998, to "liquidate or possess for his account the collateral pledged to secure the note" (M. Ex. F). But there is no evidence, even with all <u>reasonable</u> inferences drawn in Mengelt's behalf, that he ever exercised that right. Instead Mengelt's only assigned reason for his refusal of the tender (stated in his testimony under oath) was because he believed he could have made more money in the market with the use of the proceeds if the Note had been paid on the due date (Mengelt Dep. 41-42)--that was the expressly stated basis for his effort to extract some $200,000 from Telemark when it had offered to pay him the full principal amount plus accrued interest (an unjustifiable effort that his counsel have charitably sought to justify as "hard bargaining").

Importantly, Mengelt has <u>never</u> said that he was refusing tender because he had exercised his right to possess the stock for his own account. Nor did Mengelt take the action expressly contemplated by the <u>Collateral</u> paragraph of the Note, which

---

direct and collateral, which the creditor holds.

11

speaks in the future tense of "at such time as payee [Mengelt] may effect a transfer of the collateral"--a transfer that in the law of corporations involves a change in its status, requiring its entry on the books of the corporation via the issuance of a new certificate in the name of the transferee.[7] In light of Mengelt's inaction and his own testimony, the only reasonable inference is that no change in the status of the Wasatch stock had taken place--that it was still being held by Mengelt only as collateral security. Hence Telemark had the right under the Note to condition its tender on the return of that collateral security.

With this Court having determined that Telemark's March 7 offer was an effective tender of payment, the only remaining question relates to the legal effect of Mengelt's failure to return the collateral stock upon that tender. If the tender had taken place before default, Mengelt would have had a concurrent obligation to return the Wasatch stock (see Martindell, 15 Ill.App.2d at 227, 145 N.E.2d at 789-90, ruling that when an

---

[7] Mengelt cannot successfully bootstrap himself into a position of ownership of the stock by the lame testimony quoted in the Appendix to this opinion from his Dep. 26-28. Because Mengelt does not claim to have the reputed powers of a Uri Geller to cause physical changes through mental processes alone, what he claims he had "in [his] own mind" or what he "felt," or the unsupported assertion that he may have "considered it mine" (also in his own mind), cannot take the place of the objective action that is contemplated both by the law and by the Note itself (as evidenced by its just-quoted provision as to Collateral).

12

unconditional tender was rejected, the right to possession of the pledged security was revested in the pledgor). And although the effect of Telemark's delay in making tender would have permitted Mengelt to exercise his default-triggered right to possess the stock for his own account (see Am. Jur. §18), the just-completed discussion has revealed the absence of any genuine issue of fact that even implies his having done so. Consequently Mengelt must be held to have converted the Wasatch stock by having failed to return it when he had been proffered a legally unconditional tender of full payment of the Note by Telemark's March 7, 2000 offer.

Although this opinion has thus decided that Telemark's March 7 offer was a valid tender and that Mengelt became obligated to deliver the stock on what would have been the Note's payment date, this case cannot be disposed of fully at this time because there is insufficient evidence in the record to determine the appropriate amount of damages. While Telemark has provided proof that on March 8, 2000 there was one sale of Wasatch stock for $8.50 per share,[8] no real evidence has been provided as to the market value of a block of 160,000 shares on the relevant date--an issue that depends on such factors as the volume of trading and hence the stock's liquidity, as well as a host of

---

[8] As n.2 has said, that proof took the form of a report on an E-Pawn stock trade.

13

other factors that have rendered the stock extraordinarily volatile and have most recently driven it to a near-zero price.[9]

Because the Wasatch (or E-Pawn) stock is traded over the counter and because its reported trading prices have fluctuated so wildly, the record evidence cannot be viewed as establishing (especially with inferences drawn in Mengelt's favor, as they must be) that Telemark would have received $8.50 per share for the stock had Mengelt returned it promptly on becoming obligated to do so. For example, nothing before this Court speaks to the thinness of the market--whether it would have been possible to sell a block of 186,000 shares in a single transaction without significantly depressing the market price, or whether it would instead have been necessary to feed the shares into the OTC market gradually.

In that respect, it must also be recognized that Mengelt was not obligated to return the stock on the date that Telemark made its offer. Instead his obligation would have arisen when the payment was actually made available--something that would necessarily have involved at least some lapse of time for Mengelt

---

[9] On May 2, 2001 a reporting service (http://www.pcquote.com) disclosed that on the day before some E-Pawn stock sold for 2 cents a share. And Mengelt's most recent filing on April 18, 2001 has also included copies of a May 5, 2000 SEC civil complaint and a June 7, 2000 criminal indictment, each of them filed in the Southern District of New York and each of them charging major securities fraud involving Wasatch cum E-Pawn and its principals and promoters.

14

to accept the offer and then for Telemark to arrange for certified funds (it may be noted that Telemark's offer actually calculated an interest accrual to April 15, 2000, but that does not necessarily equate to deferring payment to that date).

That open question as to the date or dates of potential realization of the proceeds of sale of the shares, when coupled with the earlier-mentioned volatility in price, meant that even a few days could have made a significant difference in market value and hence in Telemark's recoverable damages. It is plain that the parties must provide additional proof on the damages issue.

## Conclusion

Because this Court finds that there is no genuine issue of fact that stands in the way of its determination that Telemark's March 7, 2000 offer constituted a valid tender so that Mengelt's rejection of that offer was a breach of his obligations under the Note, Telemark's motion for summary judgment is granted as to liability and Mengelt's is denied. That being so, Telemark is entitled to any damages stemming from Mengelt's nondelivery of the Wasatch stock in consequence of that tender, while Mengelt is entitled to offset $77,270 and no more against those damages.[10]

But because of the dearth of evidence on the factors bearing on the issue of damages, the ultimate scope of that relief

---

[10] If Telemark's damages were to turn out to be less than that figure, of course the net payment would go in the other direction.

remains to be determined. Accordingly, a status hearing is set for 8:30 a.m. May 23, 2001 to discuss the necessary procedures and schedules to that end.[11]

                                              _____
                                              Milton I. Shadur
                                              Senior United States District Judge

Date: May 4, 2001

---

[11] In scheduling that hearing this Court has allowed more time than it normally would, in the hope that reason may prevail in the form of the parties' effort--now that the key issues have been decided--to reach an accommodation, rather than expending still more resources in mortal combat.

16

Appendix

Here is Mengelt's Dep. 26-28 testimony, adverted to in n.7 (the "A." responses are his):

    A. Did I do anything to realize money on the promissory note?

    Q. Correct.

    A. I would assume that the only thing that could be construed that I did anything was probably take possession of the stock because Larry told me to. So, you know, in my own mind, and I can't come up with the numbers, my position probably would have been, and I can't recall any discussions with anybody except maybe my wife, is that whatever that stock happened to be worth at the time when Larry told me that he had no intentions of paying me and that the note was not renewable and that I could execute anything I want, more than likely I took the stock and whatever I felt that was worth at that time. Probably in my own mind if Larry had ever addressed the issue again would have reduced the indebtedness of him to that amount.

    Q. Now, you say you took possession of the stock?

    A. Sure, he gave it to me, he told me to do it.

    Q. It's my understanding that you already had possession of the stock before April 15th, 1998?

    A. I don't know that collateral is considered possession. I had it but I don't think it was mine at that time until he told me in a letter to, you know, execute whatever means, you know, whatever was appropriate and take possession of the collateral, I did.

    Q. What did you do to make it yours, to use your words?

    A. I didn't know that I had to do anything because he told me to do it, just put it in my vault.

    Q. Where was it before you put it in the vault?

    A. I don't know. It could have been in the vault already or in my house. I don't think it's a matter of

me taking the stock and moving it from someplace to another place. I think it's a matter of I felt that stock was strictly collateral.

And by the way, when the letter here refers to this stock was worth 35 cents, even when the note was provided it wasn't worth that much money, it had been reduced substantially in the process, but I only considered that collateral until someone tells me that they are not going to pay me and to execute whatever possible. So I don't know that I had any kind of definitive declaration. I, just like anybody else would do, took the collateral and considered it mine at that point and reduced Larry's indebtedness to me by that amount.

Q. I'm not asking about your thought process now.

A. That's all I can provide you right now, sir.

Q. I'm just asking you what you did. If the stock was already in the vault and you did nothing, that's fine. If it was on your desk at your home and you put it into the vault, that's fine. I just want to know what you did?

A. I can't recall that at this point.