

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3626 | **DATE** | 1/17/2002 |
| **CASE TITLE** | Telemark Development Group vs. Mengelt | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Telemark's motion for summary judgment is granted. This Court finds that Telemark suffered damages in the amount of $520,000 due to Mengelt's breach. As a result Mengelt is ordered to pay Telemark $520,000, offset by the $77,270 that Telemark owes him under its earlier unaccepted tender, for a net payment of $442,730. (24-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JAN 18 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| SN | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TELEMARK DEVELOPMENT GROUP, INC., )
)
          Plaintiff, )
)
v. ) No. 00 C 3626
)
JOHN P. MENGELT, )
)
          Defendant. )

MEMORANDUM OPINION AND ORDER

Telemark Development Group, Inc. ("Telemark") has sued John Mengelt ("Mengelt") for breach of contract on a $55,000 promissory note ("Note"), alleging that Mengelt refused (1) to accept the payment that Telemark had tendered to him in March 2000 and (2) to return stock previously delivered to him by Telemark as collateral security. This Court's May 4, 2001 memorandum opinion and order ("Opinion") granted summary judgment to Telemark on the issue of liability but left the calculation of damages unresolved.

Now the parties have filed Fed. R. Civ. P. ("Rule") 56 cross-motions for summary judgment on that issue, and the motions are fully briefed and ready for decision.[1] For the reasons

---

[1] This opinion assumes familiarity with the Opinion and therefore includes only those facts essential to resolution of the damages issue. Unless otherwise noted, all citations to the parties' submissions on the law refer to the additional memoranda that the parties have filed on the issue of damages.

stated in this memorandum opinion and order, this Court finds that Telemark suffered damages in the amount of $520,000 due to Mengelt's breach. As a result Mengelt is ordered to pay Telemark $520,000, offset by the $77,270 that Telemark owes him under its earlier unaccepted tender, for a net payment of $442,730.

<u>Summary Judgment Standards</u>

Familiar Rule 56 principles impose on each movant the burden of establishing both the lack of a genuine issue of material fact and the movant's entitlement to a judgment as a matter of law (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (<u>St. Louis N. Joint Venture v. P & L Enters., Inc.</u>, 116 F.3d 262, 265 N.2 (7th Cir. 1997)).

Where as here cross-motions for summary judgment are involved, it is thus necessary to adopt a dual perspective--one that this Court has often described as Janus-like--that sometimes compels the denial of both motions. As the ensuing discussion reflects, this opinion has been faithful to that approach, but the required dual perspective does not frustrate the entry of final judgment here.

Facts[2]

On August 27, 1997 Telemark executed and delivered to Mengelt the Note in the principal amount of $55,000, calling (1) for interest of 12% per annum retroactive to April 15, 1997 and (2) for payment by April 15, 1998 (M. St. ¶1). As collateral for the Note Telemark endorsed to Mengelt 160,000 shares of Wasatch International, Inc. ("Wasatch"), a publicly traded corporation (M. St. ¶2; T. St. ¶5).[3]

Telemark did not pay Mengelt when the Note came due, but Mengelt took no effective action to enforce its terms--either to collect the amount owed or to proceed against the collateralized shares. Nearly two years later--on March 7, 2000--Telemark offered to pay Mengelt the full principal sum of $55,000 plus interest at the rate of 12% per annum through April 15, 2000, for a total of $77,270. In turn, Mengelt was to return the stock (Opinion at 3; M. Ex. J). Mengelt rejected that proposal,

---

[2] Mengelt's LR 56.1(a)(3) statement is cited "M. St. ¶--" and Telemark's LR 56.1(a)(3) statement (which was included with its original summary judgment motion) is cited "T. St. ¶--." This opinion also employs the same "M." and "T." abbreviations in referring to the parties' exhibits and memoranda.

[3] Although at some point in time Wasatch changed its name to E-Pawn.com, Inc., the parties have continued to refer to the company as "Wasatch" in their submissions, and this opinion will do the same. As to the Wasatch shares at issue, 60,000 of those shares are owned by Telemark itself, while the other 100,000 are owned by Pacific Group, Inc. ("Pacific Group") (M. St. ¶¶2-3), a corporation wholly owned and controlled by the same individuals who own and control Telemark (Muno Aff. ¶3). As explained in n.7, however, that does not affect the result here.

stating that he wanted $200,000 in compensation before he would release the stock (M. Dep. 41-42). On March 26, 2000 Telemark faxed to Mengelt a proposed Settlement Agreement (a photocopy of which is attached to this opinion) formalizing the same terms that had been set out in the March 7 letter (Opinion at 4). Mengelt again rejected the offer.

During the time at issue in this case, Wasatch stock fluctuated wildly in value. When the Note was executed the stock was worth $.35 a share (M. Ex. A). It later climbed in value, reaching a peak of $10 per share on March 8, 2000 (T. Ex. 1 at 1). That price declined rapidly following the disclosure of securities fraud charges against the corporation in May and June 2000, and by the end of June the stock was trading at $.43 per share (see attachment to M. Resp. to T. St. on the original Rule 56 motion).[4] By the end of 2000 the stock was trading at pennies per share (M. Ex. 4).

Telemark filed this action on June 15, 2000, alleging that Mengelt had breached his legal obligations by refusing Telemark's tender and failing to return the stock. Both parties filed motions for summary judgment. This Court held in the Opinion

---

[4] In May 2001 the stock was still trading at pennies per share (Opinion at 14 n.9). It is no longer listed by any of the reporting services checked by this Court. Mengelt mentions at his R. Mem. 2--but without providing any supporting documentation--that Wasatch merged with another company in May 2001 and that the merged company's stock was later trading at $.01 per share.

4

that Telemark's March 7, 2000 offer had constituted a valid tender under Illinois law, and it therefore granted Telemark summary judgment on the issue of liability (Opinion at 15). Relatedly the Opinion held that Mengelt was entitled to offset $77,270 (the original $55,000 due to him under the Note, plus 12% interest accrued through April 15, 2000) against any damages that he might owe to Telemark due to his breach. Because as stated earlier the Opinion left the calculation of damages unresolved, this opinion now turns to that issue.

## Calculation of Damages

It is a basic principle of contract law that parties injured by a breach are entitled to recover damages that will place them in the position they would have occupied if the breached obligation had been performed (Ollivier v. Alden, 262 Ill. App. 3d 190, 196, 634 N.E.2d 418, 422 (2d Dist. 1994)). Damages should not, however, amount to a windfall (id. at 196, 634 N.E.2d at 423).

Furthermore, under Illinois law (which applies to the Note) a plaintiff has the burdens (1) of establishing that it actually sustained damages and (2) of providing the court with a reasonable basis for computing those damages (Lanterman v. Edwards, 294 Ill. App. 3d 351, 354, 689 N.E.2d 1221, 1224 (5th Dist. 1998)). Courts may not award damages based on mere conjecture or speculation (Schoeneweis v. Herrin, 110 Ill. App.

3d 800, 808, 443 N.E.2d 36, 42 (5th Dist. 1982))--but as shown hereafter, that is not a problem here.

Telemark contends that it is entitled to $1.6 million in damages, reflecting the value of the Wasatch stock on March 8, 2000--the day after Telemark extended its payment offer to Mengelt (T. Mem. 3-4). That also happens to be the date on which Wasatch stock reached its highest trading price ever. But Telemark has provided no evidence supporting its claim that damages should be calculated as of that March 8 date.

Telemark properly argues that the measure of damages for converted property is its fair market value at the time of conversion (<u>North Shore Marine, Inc. v. Engel</u>, 81 Ill. App. 3d 530, 535, 401 N.E.2d 269, 273 (2d Dist. 1980)). It then further asserts that Mengelt breached his obligation to deliver the shares on the very day it sent its offer--March 7--but it presents no support for that claim.[5] All of the available evidence runs counter to that proposition.

As stated earlier, Telemark's letter offer to Mengelt was

---

[5] Of course, if Telemark were correct that the breach occurred on March 7, then it is not actually asking for damages based on the value at the time of conversion, which would be the March 7 stock value, not the March 8 value. Instead Telemark is asking for an award of damages equivalent to the highest value reached by the stock during a reasonable time following the breach. That "lost profit" measure has been adopted by some courts (see <u>Scully v. US WATS, Inc.</u>, 238 F.3d 497, 509-10 (3d Cir. 2001) and cases cited there), but it is not applicable here in any event because the breach occurred after March 8.

6

sent on March 7, 2000. Neither party has provided evidence of how that offer was transmitted (e.g., by mail or fax transmission) or evidence of when Mengelt actually received the offer. Mengelt testified in his deposition that he responded by telephone to Telemark "within the next couple of days" after receiving the letter (M. Dep. 39-40). While that does not clarify the exact date of the breach, it certainly reflects Telemark's failure to prove that the breach occurred on March 7 or even March 8. Hence damages may not be calculated using the March 8 stock value.

While it is not possible to determine the exact date of the breach in that way, it *is* possible to determine on the evidence tendered to this Court what would have transpired if Mengelt had instead honored his obligation by accepting Telemark's offer. When the evidence is viewed with the required reasonable inferences favoring Mengelt (a view that is compelled when Telemark prevails), the transaction (money in exchange for stock) would have been completed by March 31, 2000:

    1. Telemark has presented an affidavit from Lawrence Muno, its Chairman and 50% shareholder, with supporting documentation showing that the necessary funds were in hand during March (Muno Aff. ¶3).

    2. Both Telemark's March 7, 2000 letter offer and its March 26, 2000 proposed Settlement Agreement were

nonspecific as to a precise closing date, but the forwarding letter accompanying the latter (which shows a March 27 transmission to Mengelt via fax) read:

> Enclosed please find an executed settlement agreement. If you approve, please execute and return via fax with hard copies to follow. Upon receipt of the signed agreement by fax, I will cause certified funds to be issued to you at which time we would appreciate return of the subject stock certificates.

No reason appears to prevent the "trust" arrangement (perhaps more accurately, the escrow) called for in the Settlement Agreement from producing a consummated transaction by March 31 at the latest--a reasonably conservative timetable.[6]

That does not yet resolve the issue of damages, though, because there is a dispute as to whether Telemark could have sold the stock immediately. In response to this Court's inquiry, Telemark has provided ample evidence that during the relevant time frame the active market in Wasatch stock could readily have absorbed a block of 160,000 shares in no more than a few trading days. Instead a potential problem might have stemmed from the fact that all of the stock certificates contained a legend restricting their resale. In that respect the parties have

---

[6] Although both of Telemark's communications provided for interest to be paid through April 15, 2000, the Settlement Agreement makes it clear that an earlier closing was contemplated (without any potential reduction in the total dollar amount of Telemark's offer).

8

provided additional submissions addressing the question of what effect (if any) those legends would have had on Telemark's ability to sell the stock.

Under the SEC's Rule 144(k) (17 C.F.R. §230.144(k)), restricted stock that has been owned for more than two years after acquisition from the issuer becomes exempt from resale restrictions. Because Telemark had originally acquired the stock at issue on July 9, 1997, it contends that it could have sold the stock immediately on getting it back from Mengelt in the year 2000. To support that claim it relies on an SEC interpretation (17 C.F.R. §231.6099) that says that a purchaser of securities sold in reliance on Rule 144 receives unrestricted securities if the rule's conditions are satisfied. Telemark also submits an affidavit from Dennis Gunn, a securities broker who attests that the presence of a restrictive legend on stock would have no effect on price if such an exemption applied to the stock (Gunn Aff. ¶4). But neither of those pieces of evidence addresses the question whether the holder of such stock would be free to resell it immediately without obtaining verification that the Rule 144(k) exemption does indeed apply to that particular stock.

Telemark's own actions also fail to support its argument. Mengelt has submitted the affidavit of Richard Parker, a securities transfer agent who described the well-established practice for handling stock with restrictive legends that have

expired (Parker Aff. ¶¶4-6). First the holder of the stock completes a copy of Form 144-k and submits that form along with the stock to a transfer agent (Parker Aff. ¶6). Next the agent communicates with the stock issuer, which either clears or objects to the transfer (id.). If the issuer objects, the holder must obtain a legal opinion to overcome that objection (id.). Once that process has been completed, new stock certificates--without the restrictive legend--are issued to the holder (id.). If there is no objection, the entire process takes about one week (Parker Aff. ¶7). When objections are raised, there is no limit on the amount of time it may take to resolve them (id.)

And that is precisely the process that Telemark followed with respect to other restricted Wasatch stock that it owned. On March 7, 2000 Telemark sent a request to Western States Transfer & Register ("Western States") to remove the restrictive legend from two blocks of Wasatch stock (Parker Aff. ¶8). Wasatch objected, requesting proof of Telemark's payment for the securities (Parker Aff. ¶¶9, 11). When Telemark did so, Wasatch promptly approved and issued new stock certificates (sans legend) on March 22.

In another instance, on or about March 24, 2000 Telemark sent a request to Western States to remove the restrictive legend from seven additional Wasatch stock certificates (Parker Aff. ¶13). Wasatch again requested proof of payment. This time the

10

situation was apparently more complex, for it took several months--until November 6, 2000--for Telemark to provide an opinion of counsel that would satisfy Wasatch's request (Parker Aff. ¶¶14-15). After Wasatch gave its approval, it issued a new stock certificate free of any legend on January 11, 2001 (Parker Aff. ¶16). Telemark paid Western States for all of those services (M. App. A, B).

In light of that evidence, and again giving Mengelt the benefit of reasonable inferences, this Court finds that Telemark would not have been able to sell the stock immediately after receiving it from Mengelt. Instead the evidence supports a finding that Telemark would have pursued the same process of requesting new stock certificates that it followed for the other Wasatch stock it owned.

In that respect, the plainly relevant time frame is the one occupied by the near-contemporaneous transfer request that Telemark had made on March 7. In that instance the entire process--which included a request from Wasatch for verification of payment for the stock--took 15 days. None of the evidence submitted by the parties suggests that anything about the stock now in issue would have caused its transfer to take any longer.

To be sure, Telemark also made the other earlier-described transfer request on March 24, and that one took considerably longer than 15 days to complete. But nothing in the evidence

11

submitted by Mengelt suggests that the stock pledged to him involved any complexities that would have caused it to be subject to any delay--let alone the extraordinary (and unexplained) delay encountered in that second request. With the record silent on that score, the situation presents a classic occasion for application of the general rule that uncertainties about the amount of damages stemming from the wrongdoer's misconduct must be resolved against that wrongdoer--in this case, Mengelt (Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946)).

This Court concludes that Telemark would have been able to sell the Wasatch stock 15 days after the outside date on which it should reasonably have received it from Mengelt, or more precisely on April 17, 2000 (the next working day after the 15-day period). On that date the stock was valued at $3.25 per share (see attachment to M. Resp. to T. St. on the original Rule 56 motion), so that Telemark's damages amount to $520,000.[7]

---

[7] Mengelt Mem. 4 argues that because 100,000 of the 160,000 shares are actually owned by Pacific Group, which is not a party to this action, Telemark cannot recover any damages for those shares. That argument fails for more than one reason:

    1. It is too late for Mengelt to raise what is effectively a challenge to Telemark's standing.

    2. Under the express terms of the Note, Telemark was entitled to a return of all 160,000 shares.

    3. To the extent that Telemark may be viewed as nominee or agent for Pacific Group (which is owned by the

12

## Conclusion

Because this Court concludes that the proper calculation of damages is a function of the market value of Wasatch stock as of April 17, 2000, Telemark is entitled to damages in the amount of $520,000. Because Mengelt is entitled to offset that amount by the $77,270 that Telemark owes him under the terms of the contract, Mengelt is ordered to pay Telemark net damages in the amount of $442,730.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 17, 2002

---

    same people as Telemark, it will be recalled), it is entitled to receive the full measure of damages in this action--it will simply be accountable to Pacific Group for its aliquot share.

# SETTLEMENT AGREEMENT

This Settlement Agreement is by and between Telemark Development Group, Inc. (Telemark) represented by its Officers and Directors, Lawrence J. Muno and Peter R. Del Mastro acting on behalf of Telemark, a Nevada Corporation, and John P. Mengelt (Mengelt), a married man and a resident of the State of Illinois.

This agreement refers to that certain Promissory Note dated April 15, 1997 and executed by the parties on August 27, 1997. The makers have proposed a settlement of all outstanding issues between the parties. The proposal provides a onetime payment of Seventy-Seven Thousand Two Hundred and Seventy Dollars ($77,270.00USD) to Payee which includes the payment of the promised amount of Fifty-Five Thousand Dollars ($55,000.00USD) plus interest at the rate of 12% per annum through April 15, 2000.

Upon execution of this agreement by all of the parties, the Makers agree, through their attorney, to provide the payment. The Payee, acting on his own behalf, agrees to provide the return of the collateral identified as common stock in Wasatch International, Inc. totaling 160,000 shares enumerated as follows:

Certificate Number 3773 / 100,000 Shares
Certificate Number 3757 /   5,000 Shares
Certificate Number 3758 /   5,000 Shares
Certificate Number 3767 /  20,000 Shares
Certificate Number 3770 /  30,000 Shares

The exchange of funds and collateral will be accomplished through the Law Offices of John A. Flynn, acting in a trust capacity for the parties.

The parties by their signatures below agree to the terms and conditions as expressed herein and agree to forever hold each other harmless from any and all future claims regarding the subject note.

Maker:

_____  2/26/00
Lawrence J. Muno     Date

_____  2-26-00
Peter R. Del Mastro   Date

Acting on behalf of Telemark
Development Group, Inc.

Payee:

_____
John P. Mengelt      Date
A married man acting as an individual